IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| D. HOUSTON, INC., *et al*., §<br>§<br> *Plaintiffs*, §<br>§<br>v. §<br>§<br>JOVITA CARRANZA, in her Official §<br>Capacity as Administrator of the Small §<br>Business Administration, *et al*., §<br>§<br> *Defendants*. § | CIVIL ACTION NO. 4:20−cv−02308 |

## **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move for a preliminary injunction against Defendants, the United States Small Business Administration ("SBA"), and Jovita Carranza, in her official capacity as the SBA Administrator. Plaintiffs ask the Court to preliminarily enjoin Defendants from using 13 C.F.R. § 120.110(p) as a criterion for Paycheck Protection Program ("PPP") loan eligibility and further require Defendants to direct identified lenders that they must process Plaintiffs' applications without reference to the rule.

Because PPP funds are dwindling, Plaintiffs ask the Court to consider this Motion on an expedited basis.

1

## SUMMARY

Plaintiffs would be eligible to benefit from the PPP provisions of the CARES Act[1] but for the Administrator's application of 13 C.F.R. § 120.110 ("Ineligibility Rule"). Subpart (p) classifies businesses that "[p]resent live performances…" or "[d]erive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature," as ineligible to participate in SBA lending programs. *Id*. at § 120.110(p)(1)-(2).

Plaintiffs are likely to succeed on the merits of their claims that subpart (p) violates the First and Fifth Amendments. Subpart (p) does not further the purpose of the PPP. "The intent of the [CARES] Act is that SBA provide relief to America's small businesses expeditiously," 85 FED. REG. 20811, not "deny a benefit to a person *because* he exercises a constitutional right." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545 (1983) (emphasis added).

Subpart (p) is a viewpoint-based classification. Its application turns on whether a business's commercial activities—even if lawful—includes an expression-based element deemed "prurient." To apply the rule, the Administrator deputizes bank personnel to act as gatekeepers, instructing them to "consider

---

[1] Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), PUB. L. NO. 116-136, 134 STAT. 281 (March 27, 2020).

whether the nature and extent of the sexual component causes the business activity to become prurient" before processing a PPP loan application. Standard Operating Procedure (SOP 50 10 5(K) § III.A.15) ("2019 SOP"), at. p. 114.

In addition to subpart (p)'s discriminatory effect on businesses who exercise a right, the Administrator selectively applies the Ineligibility Rule's other classifications. For instance, religious organizations were relieved of their ineligible status after the Administrator realized that "she does not have a compelling interest in denying emergency assistance to faith-based organizations … facing the same economic hardship to which the CARES Act responded and who would be eligible for PPP but for" their exercise of fundamental rights. 85 FED. REG. 20817, 20820. The Administrator also gave casinos preferential treatment, waiving their ineligibility to take an "approach more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses." 85 FED. REG. 23450, 23451.

The Administrator ignores these rationales when it comes to subpart (p)'s continued application. Two district courts preliminarily enjoined Defendants from using subpart (p), and the Sixth Circuit signaled its view that the rule is infirm.[2] The result should be the same in this matter.

---

[2] *See generally Camelot Banquet Rooms, Inc. v. SBA*, 20-C-0601, 2020 WL 2088637 (E.D. Wis. May 1, 2020) (granting preliminary injunction against SBA on First and Fifth Amendment grounds); *DV Diamond Club of Flint, LLC v. SBA*, 20-CV-10899, 2020 WL 2315880 (E.D. Mich. May 11, 2020) (granting preliminary injunction against SBA on grounds that subpart (p) is invalid under the Administrative Procedures Act); *DV Diamond Club of Flint, LLC v. SBA*, 960 F.3d 743 (6th Cir. 2020) (denying SBA's motion to stay preliminary injunction).

## BACKGROUND

Plaintiffs are small businesses that serve food, alcohol, and provide entertainment to the consenting adult public. Except for D. Procyon, LLC, all Plaintiffs feature exotic dancing. The entertainment—performed clothed and in various stages of undress—is lawful, non-obscene expression that is no more scandalous or "prurient" than what is often depicted in mainstream movies.[3]

Plaintiffs' businesses satisfy all statutory criteria for PPP loan eligibility. They qualify as "any business concern[s]" with less than 500 employees each. 15 U.S.C. § 636(a)(36)(D). They were in operation during the relevant timeframe, had employees for whom they paid salaries and payroll taxes, along with independent contractors reported on 1099-MISCs. *Id.* at § 636(a)(36)(F). As "eligible recipients," they face the same "uncertainty of current economic conditions" that prompted PPP loan requests from thousands of other small businesses. *Id.* at § 636(a)(36)(G).[4]

Only the decades-old Ineligibility Rule stands in the way. In the mid-1990s, the SBA decided that certain business activities, "while not illegal, may be considered by the average person to be obscene or pornographic," so therefore "an establishment featuring nude dancing … would not be eligible for SBA financial

---

[3] Declaration of David Davari ("Davari Decl."), ¶¶ 3-5. D. Procyon—which operates a typical nightclub in Las Vegas named "Embassy" that features no exotic dancing—was inexplicably denied PPP loans along with the other Plaintiff entities. However, D. Procyon's loan application was approved by a lender on July 30, 2020.

[4] *See* Plaintiffs' PPP Loan Applications, **Exhibits A-G**, attached to Davari Decl., ¶¶ 7-12.

assistance…." 60 FED. REG. 64356, 64360 (Dec. 15, 1995). Relying on this rationale, the SBA promulgated the Ineligibility Rule with subpart (p) included.

Two decades into this century, the Administrator continues to apply subpart (p), directing SBA-approved lenders to evaluate whether "the nature and extent of the sexual component causes the business activity to be prurient." 2019 SOP, at. p. 114.[5] Then, "[i]f a Lender finds that the Applicant may have a business aspect of a prurient sexual nature, prior to submitting an application to the [Loan Guaranty Processing Center] … the Lender must document and submit the analysis … for a final Agency decision on eligibility." *Id.*

After the CARES Act became law earlier this year, the Administrator used her emergency rulemaking authority under 15 U.S.C. § 9012 to promulgate the "Interim Final Rule." 85 FED. REG. 20811. The Administrator explained in the Interim Final Rule that the Ineligibility Rule and 2019 SOP remained in effect for determining PPP eligibility. *Id.* at 20812.

Beginning in April 2020, Plaintiffs ran headlong into subpart (p) after they unsuccessfully attempted to submit their PPP loan applications to several SBA-approved lenders. The first lender they approached would not process their applications because of "push back on processing PPP loan applications for

---

[5] A true and correct copy of relevant excerpts from the 2019 SOP is attached as **Exhibit M**.

[sexually oriented businesses]."[6] A second lender also refused to process Plaintiffs' loan applications because "[w]e are told that it has always been the rule of the SBA not to make loans to SOBs."[7]

In May 2020, Plaintiffs sent both lenders the Eastern District of Michigan's *DV Diamond Club* opinion hoping it had caused circumstances to change. The opinion did not alter the lenders' decisions, so Plaintiffs submitted their applications to a third lender who also declined to accept their applications for processing.[8]

In mid-June 2020, Plaintiffs submitted their loan applications to a fourth lender, Plains State Bank. A few days after submitting Plaintiffs' applications to the SBA, the lender explained that their loan requests had been denied: "It's unfortunate that SBA denied this request based on the characteristic of the business…. My apology [sic] really tried."[9]

With the PPP's window for applications closing, Plaintiffs filed suit on June 30, 2020. (Dkt. No. 1). The Court denied Plaintiffs' initial request for a temporary restraining order and motion to reconsider, (Dkt. No. 4, 10), noting in the latter that Plaintiffs would remain free to re-urge their request for injunctive relief.

---

[6] Davari Decl., ¶¶ 13-14, **Exhibit H**, April 22, 2020 email from BancorpSouth.
[7] *Id.,* ¶ 16, **Exhibit I**, April 28, 2020 email from Spirit of Texas Bank.
[8] *Id.*, ¶¶ 17-19, **Exhibit J**, May 15, 2020 email from Spirit of Texas Bank.
[9] *Id.*, ¶¶ 20-21, **Exhibit K**, June 23, 2020 email from Plains State Bank.

After filing their Amended and Supplemental Complaint on July 17, 2020, (Dkt. No. 11), one Plaintiff tried again. On July 30, 2020, D. Houston, Inc. applied for a PPP loan with "Cross River Bank via BlueVine Capital Inc." The lender quickly denied the application, stating that "[w]e have given Applicant's request careful consideration, and regret that we are unable to extend credit to Applicant at this time for the following reason(s): 1. Applicant's business industry is ineligible for this credit product[.]"[10] It is apparent that without a preliminary injunction, Plaintiffs' future efforts to apply for PPP loans will be futile.

## ARGUMENT & AUTHORITIES

A preliminary injunction applicant must establish that "[1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All elements are satisfied.

## I.   Likelihood of Success on the Merits

"A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes," but must present a *prima facie* case. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). In First Amendment cases, a plaintiff is deemed likely

---

[10] A true and correct copy of the BlueVine "Decision Notice" is attached as **Exhibit L.**

to prevail unless the government carries its burden of satisfying the compelling interest test. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006), citing *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

## A.  Sovereign Immunity and Availability of Injunctive Relief

First, to account for sovereign immunity and the availability of injunctive relief, Plaintiffs assert their constitutional claims under the Administrative Procedure Act ("APA"), or in the alternative, on a non-statutory basis.[11]

Ordinarily, the APA supplies a cause of action for review of agency action that is "contrary to constitutional right…." 5 U.S.C. §§ 704, 706(2)(B). The APA also waives an agency's sovereign immunity for suits seeking non-monetary relief unless "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id*. at § 702. Congress has provided a separate statutory waiver of the Administrator's sovereign immunity, one that includes an anti-injunction component. 15 U.S.C. § 634(b)(1).

As Defendants previously argued,[12] the Fifth Circuit interprets § 634(b)(1) to mean that "all injunctive relief directed at the SBA is *absolutely prohibited*." *In re Hidalgo County Emerg. Serv. Found*., 20-40368, 2020 WL 3411190, at *1 (5th Cir. June 22, 2020) (emphasis original). Assuming *arguendo* that § 634(b)(1) prevents

---

[11] *See generally* Amended Complaint, [Dkt. No. 11], ¶¶ 48-85.
[12] Defendants' Response to Plaintiffs' Motion for Reconsideration ("Response") [Dkt. No. 8].

prospective injunctive relief against the Administrator in connection with a cause brought via the APA, Plaintiffs would have no means of obtaining *any* form of relief.

However, "[i]f a plaintiff is unable to bring his case predicated on [a] … statutory review provision, he may still be able to institute a non-statutory review action." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Thus, to the extent that injunctive relief is unavailable under the APA, Plaintiffs bring their causes of action as arising directly under the First and Fifth Amendments. *See, e.g., Davis v. Passman*, 442 U.S. 228, 242 (1979). The correlated non-statutory review doctrine allows review of *ultra vires* agency action and permits courts to grant injunctive relief. *See generally Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949). "Direct officer suits seeking prospective injunctive relief are an exception to sovereign immunity" and may be brought where an officer's conduct, even if statutorily authorized, offends the Constitution. *Anibowei v. Barr*, 3:16-CV-3495-D, 2019 WL 623090, at *4 (N.D. Tex. Feb. 14, 2019).

## B.    First Amendment Claims

Plaintiffs are likely to succeed on their First Amendment challenge to subpart (p) on its face and as-applied. It is a content or viewpoint-based rule that discriminates against Plaintiffs because they feature entertainment in the form of

non-obscene exotic dancing, which is protected expression under the First Amendment. *See Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981).

    1.    <u>Tying PPP loan eligibility to expression violates the First Amendment</u>

The threshold issue is the extent to which the government may permissibly restrict access to (or use of) a subsidy without violating the First or Fifth Amendments. The line between permissible limits and invidious discrimination depends on the subsidy's purpose and the limitation's relationship to the purpose.

Where the government allocates public funds to promote an interest, it may limit recipients' expression or activity if it is incompatible with the program's aims. For example, in *Rust v. Sullivan*, the subsidy in question was a Title X funded family-planning program. Congress declared that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Rust*, 500 U.S. 173, 179 (1991). The Secretary of Health and Human Services issued regulations prohibiting recipients from counseling patients on abortion as a method of family planning. *Id*.

The Supreme Court explained that the regulation was permissible because the government is entitled "to fund a program dedicated to advance certain permissible goals." *Rust*, 500 U.S. at 194-95. The Constitution does not prevent the government from dictating how public funds are used, nor does it oblige the government to "subsidize analogous counterpart rights." *Id*. By enforcing the challenged regulation

within the confines of the program's purpose, the "[g]overnment is not denying a benefit to anyone, but is instead simply insisting that public funds be spent *for the purposes for which they were authorized.*" *Id.* at 196. (emphasis added).

However, the government violates the First Amendment if it creates a broad subsidy and selectively discriminates against otherwise eligible participants because of their viewpoints. For example, in *Rosenberger v. Rector & Visitors of Univ. of Virginia*, a public university created a "Student Activities Fund" intended "to support a broad range of extracurricular student activities that 'are related to the educational purpose of the University.'" *Rosenberger*, 515 U.S. 819, 824 (1995). The program's guidelines identified certain activities "that are otherwise eligible for funding" as disqualified from receiving funds, namely "religious activity." *Id.* at 824-25.

Likening the fund's broad purpose to a public forum in a "metaphysical" sense, *Rosenberger*, 515 U.S. at 830, the Court reasoned that the ineligibility criteria could not be justified since the university was not "itself speak[ing] or subsidiz[ing] transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834. The government could not create a fund to broadly facilitate speech on the one hand and "silence the expression of selected viewpoints" through denial of funding on the other. *Id*. at 835.

Here, the program at issue has a broad economic purpose. With the CARES Act and PPP, the government is not itself acting as the 'speaker' who promotes a discrete social interest. There is no 'message' that the government is paying private entities to convey, nor is the government funding a diversity of views. The titular purpose of the PPP is "paycheck protection" because the nation has an interest in avoiding mass unemployment caused by the pandemic. Congress's purpose in guaranteeing $659 billion for lending "is to extend a lifeline to all small businesses," so that they can keep people employed, "not to promote or encourage any specific subset of small businesses." *Camelot,* 2020 WL 2088637, at *8, 9.

Against this backdrop, the Administrator cannot credibly cast subpart (p) as necessary to "ensure that the limits of the federal program are observed." *Rust*, 500 U.S. at 194. "Congress intended that the SBA would make the PPP loan guarantees widely available to small businesses across the commercial spectrum." *DV Diamond Club*, 2020 WL 2315880, at *1. The government "[i]ncreased eligibility for certain small businesses and organizations," 15 U.S.C. § 636(a)(36)(D), by tying PPP eligibility to the neutral parameters of business size and need, not political, religious, or social affiliations, let alone the entertainment that a business features.

The Administrator cannot claim that subpart (p) reflects the government's election to permissibly fund the exercise of some rights but not others. Congress imposed no "prohibition on a project grantee or its employees from engaging in

activities outside of the project's scope." *Rust*, 500 U.S. at 194.  Authorized use of borrowed funds is limited to business overhead, namely paying employees, not what a business pays workers to lawfully make, sell, do, or say. Congress charged the Administrator with providing "relief to America's small businesses expeditiously," 85 FED. REG. 20811, not exceed the PPP's scope by withholding relief from small businesses based on the expressive component of their lawful commercial activities.

> 2.    <u>Subpart (p) is viewpoint or content-based</u>

Even though the PPP's scope has nothing to do with funding speech, subpart (p) "has a speech-based restriction as its sole rationale and operative principle." *Rosenberger*, 515 U.S. at 834. Its defining classificatory characteristic is whether a business engages in particular type of expression, *i.e.*, presentation of "live performances" or "any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110(p)(1)-(2). Subpart (p) therefore "applies to particular speech because of the topic discussed or the idea or message expressed" and is "targeted at [the] specific subject matter" of sexuality. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 169 (2015).

Subpart (p) is more than a generally applicable content-based rule. The classification only applies to businesses that feature performance of a "prurient" sexual nature, a term of art denoting "material having a tendency to excite lustful thoughts," or a "shameful or morbid interest in nudity [or] sex" that goes

-13-

"substantially beyond customary limits of candor in description or representation of such matters." *Roth v. United States*, 354 U.S. 476, 487, n. 20 (1957). According to the Administrator, a lawful business is "prurient" and therefore ineligible if it "may be considered by the average person to be obscene or pornographic." 60 FED. REG. at 64360.

Given the negative connotations and subjective application of "prurient," the term limits PPP loan eligibility by "distinguish[ing] between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2300, (2019). Businesses are only eligible for PPP loans if they feature 'decent' matters of a sexual nature, that is, so long as their "messages accord with, but not when their messages defy, society's sense of decency or propriety." *Id.* "[I]n the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *see AIDS Action Comm. v. Massachusetts Bay Transp. Auth*., 42 F.3d 1, 12 (1st Cir.1994) (finding "appearance of viewpoint discrimination" where "conventional" but "overtly sexual and more blatantly exploitative" *Fatal Instinct* movie ads were permitted, but innuendo-filled condom ads that provoked "homophobic reactions from the public" were banned).

-14-

What underscores subpart (p)'s operation as a viewpoint-based rule is that under the 2019 SOP, two sets of "authorities must necessarily examine the content of the message that is conveyed" to determine whether a business's expression is socially acceptable or impermissibly "prurient." *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 383 (1984). By its very nature, subpart (p) is a regulation that "permit[s] the Government to discriminate on the basis of the content of the message [which] cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984).

### 3.    Subpart (p) is vague and overbroad

As a viewpoint-based rule that differentiates among businesses based on subjective evaluations of content, subpart (p) is a vague standard prone to "arbitrary and discriminatory enforcement[.]" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998). This is because subpart (p)'s standalone use of "prurient" refers to one part of the first prong of the Supreme Court's obscenity test: "whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest." *Miller v. California*, 413 U.S. 15, 40 (1973); *see Reno v. ACLU*, 521 U.S. 844, 872-73 (1997) (finding Communications Decency Act's use of "patently offensive" vague because it abandoned *Miller's* requirement that the phrase be "specifically defined by the applicable state law").

-15-

The purpose of the *Miller* test's "community standards" component "is to be certain that, so far as material is not aimed at a deviant group, it will be judged by its impact on an average person, rather than a particularly susceptible or sensitive person—or indeed a totally insensitive one." *Miller*, 413 U.S. at 33. Subpart (p) ignores this standard and provides no baseline for an "average person" to determine "prurient" impact. Application of the rule depends on unbounded discretion, the application of which may change with each era, demographic, region, and individual. *Miller v. Civil City of S. Bend*, 904 F.2d 1081, 1091–92 (7th Cir. 1990) ("Thirty years ago a striptease that ended in complete nudity would have been thought obscene. No more") (Posner, J., concurring).

Subpart (p) also ignores *Miller's* "taken as a whole" requirement, which places "prurient" into context as a metric for gauging the expression's redeeming value and impact on an "average person." Without the "taken as a whole" benchmark, a reviewing lender or SBA official may decide that even a negligible "sexual component causes the business activity to be prurient," so therefore the entire business is ineligible. 2019 SOP, at p. 114. The result is that the threshold for ineligibility under subpart (p) becomes virtually non-existent; all erotic expression inherently involves at least *some* level of "prurient" appeal. *See Miller*, 904 F.2d at 1091–92 ("Of course, there would be no female stripteases without a prurient interest in the female body; but that is just to say that there would be no erotic art without

-16-

Eros"); *see also Ashcroft v. ACLU*, 535 U.S. 564, 579 (2002) ("Material appeals to the prurient interest, for instance, only if it is in some sense erotic").

Subpart (p)'s vagueness dovetails with its overbreadth. Assuming the rule has any legitimate sweep, a substantial number of its application are unconstitutional. *United States v. Stevens*, 559 U.S. 460, 473 (2010). A business is categorically barred if it derives "more than de minimis gross revenue" from the "sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature." 13 C.F.R. § 120.110(p)(2). According to the Administrator, "an establishment featuring nude dancing, or a book, magazine or video store containing merchandise of a prurient sexual nature would not be eligible for SBA financial assistance…." 60 FED. REG. at 64360. Not only are run-of-the-mill strip clubs ineligible, so are businesses whose lenders or SBA personnel decide may have sold a few too many copies of mainstream erotica like *Fifty Shades of Grey* or *9½ Weeks* before the pandemic.

The 'review' process only exacerbates these harms. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (overbreadth claims exist where "official approval under laws that delegate[] standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights"). As seen in Plaintiffs' circumstances, private banking personnel decline to even process an application if they believe there is a "business aspect of a

prurient sexual nature." 2019 SOP, at p. 114. If the lender forwards the application to the SBA for further review, the final ineligibility decision is made in the dark, leaving the applicant with no means of challenging the classification.

Between the non-existent standards for assessing what is "prurient" and required official scrutiny of content, the only way for a business to ensure its eligibility for PPP lending would be to go back in time and repudiate revenue from the sale of any goods, services, or entertainment that might be deemed "prurient." *See League of Women Voters*, 468 U.S. at 400 (finding prohibition on editorializing impermissible where TV stations had "no way of limiting the use of its federal funds to all noneditorializing activities" and were "barred from using even wholly private funds to finance its editorial activity"). In ordinary times, subpart (p) serves no purpose but to impose a financial disincentive on businesses that feature a particular kind of content. In the context of a fund intended to keep small businesses afloat in the face of ubiquitous economic hardship, subpart (p) takes on an additional utility— driving disfavored businesses out of the marketplace.

## C.   Fifth Amendment Equal Protection Claims

Equal protection analysis applies where a classification discriminates against those who exercise a fundamental right, including rights guaranteed by the First Amendment. *Romer v. Evans*, 517 U.S. 620, 631 (1996). As discussed above, subpart (p) creates an exclusionary classification that explicitly turns on whether a

business engages in protected First Amendment activity. The Administrator has imposed a "broad and undifferentiated disability on a single named group" that would be eligible for the PPP but for application of subpart (p). *Id.* at 632.

The discriminatory line-drawing is obvious. A bar, nightclub, or similar commercial establishment that features no form of entertainment is eligible for PPP loans. That same establishment remains eligible if it features entertainment (*e.g.,* musicians, comedians, or theatrical performance) that is deeply offensive or taboo to an "average person." Yet, according to the Administrator, that establishment is ineligible if it presents "prurient" entertainment involving matters of sexuality.

The differential treatment extends to the classifications within the Ineligibility Rule itself. The Administrator permitted otherwise ineligible religious organizations to apply for PPP funding *because* they exercise protected rights, finding no compelling interest "in denying emergency assistance to faith-based organizations that are facing the same economic hardship to which the CARES Act responded and who would be eligible for PPP but for their faith-based organizational and associational decisions." 85 FED. REG. at 20819; 13 C.F.R. § 120.110(k).

Likewise, "[b]usinesses primarily engaged in political or lobbying activities" are historically considered ineligible. 13 C.F.R. § 120.110(r). Numerous examples of businesses engaged in lobbying or political activities who received funds are easy to find, *e.g.*, "More than two dozen Washington lobbying, public affairs and

consulting firms received loans from the federal government to help them weather the pandemic[.]"[13]

Beyond affirmatively waiving the Ineligibility Rule for businesses who happen to exercise favored fundamental rights, the Administrator jettisoned ineligibility classifications whose rationales presumably sounded in advancing the "public interest." For example, businesses that derive "more than one-third of gross annual revenue from legal gambling activities" are ineligible under 13 C.F.R. § 120.110(g). In April 2020, the Administrator rescinded subpart (g), declaring that the "public interest" would be served by relieving gambling establishments of their disfavored status in light of the PPP's purpose:

> A business that is otherwise eligible for a PPP Loan is not rendered ineligible due to its receipt of legal gaming revenues ... On further consideration, the Administrator, in consultation with the Secretary, believes this approach is more consistent with the policy aim of making PPP loans available to a broad segment of U.S. businesses.

85 FED. REG. 23450. "Businesses with an Associate who is incarcerated, on probation, on parole, or has been indicted for a felony or a crime of moral turpitude" were ineligible. 13 C.F.R. § 120.110(n). On April 6, 2020, several members of

---

[13] Theodoric Meyer, *Among those who got PPP loans: Washington lobbying firms*, POLITICO, July 6, 2020, https://www.politico.com/news/2020/07/06/ppp-loans-washington-lobbying-firms-350020; Jimmy Vielkind, *Top New York Lobbying Firms Took PPP Loans*, WALL STREET JOURNAL, July 19, 2020, https://www.wsj.com/articles/top-new-york-lobbying-firms-took-ppp-loans-11595199600; Jeanna Smialek, *Lobbyists, Law Firms and Trade Groups Took Small-Business Loans,* THE NEW YORK TIMES, July 6, 2020, https://www.nytimes.com/2020/07/06/us/ppp-small-business-loans.html, (*last accessed* Aug. 3, 2020).

Congress wrote the Administrator to express their disagreement with the continued use of subpart (n), explaining that "the [Ineligibility] Rule contains many restrictions that were not only not included in the CARES Act, they were not intended by Congress at all…."[14] The Administrator heeded these concerns, announcing that "[a]fter further consideration, the Administrator, in consultation with the Secretary of the Treasury (the Secretary)" would change the rule to be "more consistent with Congressional intent to provide relief to small businesses…." *See* 85 FED. REG. 36717, 36718.

On July 6, 2020, the SBA revealed which businesses received PPP loans.[15] A cursory search of the data reveals that that other provisions of the Ineligibility Rule have not been enforced. "Financial businesses primarily engaged in the business of lending, such as banks" who received PPP loans are easily identified.[16] 13 C.F.R. §

---

[14] Letter from Cedric L. Richmond to Secretary Mnuchin and Administrator Carranza, April 6, 2020, https://richmond.house.gov/sites/richmond.house.gov/files/04.06.2020%20Letter%20to%20Treasury%20SBA%20re%20PPP%20Collateral%20Consequences.pdf, (*last accessed* Aug. 3, 2020).

[15] Moiz Syed, *Tracking PPP Loans*, PROPUBLICA, July 7, 2020, https://projects.propublica.org/coronavirus/bailouts/, (providing a searchable database of businesses that received loans exceeding $150,000). All data may be accessed at U.S. Dept. of the Treasury, *SBA Paycheck Protection Program Loan Level Data*, https://home.treasury.gov/policy-issues/cares-act/assistance-for-small-businesses/sba-paycheck-protection-program-loan-level-data, (*last accessed* Aug. 3, 2020).

[16] Data accessed at https://projects.propublica.org/coronavirus/bailouts/search?q=lending reveals the following examples: •OpenRoad Lending, *About Us*, https://www.openroadlending.com/us/ ("OpenRoad Lending … is an award winning auto finance company"); •LendingUSA, *Home Page*, https://lendingusa.com/ ("We approve loans for higher ticket goods and services …"); •Nationwide Acceptance, LLC, *About*, https://www.nac-loans.com/about, ("Our businesses include personal loans, automobile retail sales financing, collection services and bulk purchases of contract receivables") (*last accessed* Aug. 3, 2020).

120.110(b). The same holds true for supposedly ineligible life insurance companies.[17] *Id*. at § 120.110(d). Private clubs that "limit the number of memberships for reasons other than capacity" are ineligible, *id*. at § 120.110(i), yet members-only clubs such as the 'Private Club at Silverleaf' in Arizona, and the Soho House, a "global private members club reportedly valued at $2 billion"[18] are reported to have received PPP funding.

"Simply put, Congress did not pick winners and losers in the PPP." *DV Diamond Club*, 2020 WL 2315880, at *1. The Administrator is using her emergency rulemaking powers to do precisely the opposite, declaring those who were previously ineligible under 13 C.F.R. §§ 120.110(b), (d), (g), (i), (k), (n), (r) as 'winners,' while Plaintiffs and other allegedly "prurient" businesses under subpart (p) remain the 'losers' in a program designed to assist *all* lawful small businesses.

---

[17]   Data accessed at https://projects.propublica.org/coronavirus/bailouts/search?q=%22life+insurance%22 reveals the following examples: •National Family Care Life, *Life Insurance*, http://www.nfclife.com/life-insurance/ (describing life insurance products); •Texas Life Insurance Company, *History & Service,* https://www.texaslife.com/History.html ("Texas Life Insurance Company is the oldest life insurance company in Texas") (*last accessed* Aug. 3, 2020).

[18]   Silverleaf Realty, *The Club*, https://silverleaf.com/community-life/the-club/, ("Proposals for membership are by invitation only and are separate from property ownership"); Kelly Gilblom, *Soho House Received Up to $22 Million in Pandemic-Linked Loans*, Bloomberg, July 6, 2020, https://www.bloomberg.com/news/articles/2020-07-07/soho-house-received-up-to-22-million-in-pandemic-linked-loans, (*last accessed* Aug. 3, 2020).

## D.  Strict Scrutiny Applies

Because Subpart (p) disadvantages a group merely because they exercise a fundamental right, the government must show that "the classification promotes a compelling governmental interest and, if so, whether [it] is narrowly tailored such that there are no less restrictive means available to effectuate the desired end." *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993).

Defendants cannot satisfy their burden because there is no compelling interest in classifying Plaintiffs as ineligible under subpart (p). They do not engage in illegal activity. Plaintiffs face the same economic hardships faced by thousands of other businesses and to which the CARES Act responded. They too employ individuals who depend on their operations for their own livelihoods.

The Administrator cannot justify subpart (p)'s application on grounds that she needs to direct "limited financial resources in ways that will best serve the public interest,"[19] so therefore adult cabarets ought to remain ineligible because they transgress the "public interest." As illustrated above, "even the SBA recognizes Congress's willingness to support employees in lines of business that were previously disfavored." *DV Diamond Club*, 2020 WL 2315880, at *15. The credibility of this Victorian-era logic supporting subpart (p) disappeared once the Administrator funded establishments that profit from gambling, a vice-oriented

---

[19] Response, p. 5

-23-

activity that, unlike erotic dancing, is functionally *outlawed* in many states. *See, e.g.*, TEX. CONST. art. III, § 47 (requiring legislature to prohibit forms of gambling); TEX. PENAL CODE § 47.01 *et seq*.

Nor can the Administrator justify "viewpoint discrimination among private speakers on the economic fact of scarcity." *Rosenberger,* 515 U.S. at 835. The PPP is not some small, transitory grant to aid the arts and culture. The $2.2 trillion CARES Act is the largest economic stimulus package in U.S. history. Through the PPP, Congress allocated hundreds of billions of dollars to provide a lifeline to all lawful businesses.[20]

The decision to maintain subpart (p) seems inexplicable by anything but animus towards the class it affects. There is no statutory prerogative for the Administrator to save certain businesses while allowing others to sink because some might find their operations objectionable. "Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause," let alone strict scrutiny. *Lawrence v. Texas*, 539 U.S. 558, 582 (2003).

There is nothing narrowly tailored about rendering an entire class of business establishments ineligible for financial assistance because of their expression. The

---

[20] By comparison, the Troubled Asset Relief Program ("TARP") 'bank bailout' was $700 billion. PUB. L. NO. 110-343, 122 STAT. 3765 (Oct. 3, 2008).

classification "is at once too narrow and too broad. It identifies [businesses] by a single trait and then [denies them PPP loans] across the board." *Romer*, 517 U.S. at 633. If the Administrator wanted to use less restrictive means, she could have simply relegated businesses that traffic in unlawful or "obscene" material as defined under the *Miller* test to the realm of ineligibility.

In all respects, subpart (p) subverts the purpose of the PPP, defies the will of Congress, and contravenes the First and Fifth Amendments to the Constitution. Its continued use must be enjoined.

## II.   Irreparable Injury

It is far more likely than not that Plaintiffs will suffer irreparable injury without an injunction. *Winter*, 555 U.S. at 21. The PPP is a rapidly depleting fund administered on a first-come, first serve basis. *See* 85 FED. REG. at 20813. As of July 24, 2020, $130 billion remains available.[21] This amount will continue to diminish because, on July 4, 2020, the President signed into law an act that reauthorizes PPP lending through August 8, 2020. PUB. L. 116-147, 134 STAT. 660. The remaining sums will almost certainly be depleted by the time this case has been litigated to conclusion.

---

[21] U.S. Small Business Administration, *Paycheck Protection Program Report,* https://home.treasury.gov/system/files/136/SBA-Paycheck-Protection-Program-Loan-Report-Round2.pdf, (*last accessed* July 28, 2020).

Plaintiffs have no adequate remedy at law "because Defendants have sovereign immunity from any claim for monetary damages." *DV Diamond Club*, 2020 WL 2315880, at *16, citing *Camelot*, 2020 WL 2088637, at *11. Once the PPP is depleted, the money is gone, and Plaintiffs will have no remedy at all even if they ultimately prevail.

## III.   <u>Balance of Harms and Public Interest</u>

"Once an applicant satisfies the first two factors, the traditional [equitable relief] inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the balance of harms weighs in Plaintiffs' favor. Whereas Plaintiffs face a substantial risk of losing their businesses,[22] Defendants will lose nothing. "[A]n injunction requiring the SBA to guarantee the plaintiffs' loans would not cause the SBA any financial loss." *Camelot*, 2020 WL 2088637, at *12. No hardship would befall Defendants if the Court grants a preliminary injunction; they would only be required to guarantee Plaintiffs' loans, something that the SBA has freely done for tens of thousands of other small businesses who face the same economic hardship as do Plaintiffs.

The public interest also favors a preliminary injunction. The Fifth Circuit has stated that "[i]njunctions protecting First Amendment freedoms are always in the

---

[22] Davari Decl., at ¶¶ 9, 10, 22.

public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quotation marks and citation omitted). The Sixth Circuit explained that "[t]he public interest is served in guaranteeing that any business … receive loans to protect and support their employees during the pandemic which, we can all agree, constitutes extraordinary circumstances." *DV Diamond Club,* 960 F.3d at 747.

**IV.   Bond Amount**

Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction  ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c).

No bond should be required of Plaintiffs. "Forcing Plaintiffs to post a bond would frustrate the purpose of the PPP and the purpose of the injunction—to get essential PPP loans to struggling small businesses as soon as possible so that the businesses may use the funds to pay displaced employees." *DV Diamond Club,* 2020 WL 2315880, at *17. The government will suffer no "damages" if this Court issues a preliminary injunction and Plaintiffs receive the applied-for loans while this case remains pending. "If the plaintiffs ultimately lose this case, the defendants might demand that the plaintiffs immediately repay the amount of the loans rather than receive loan forgiveness ...," in which event the money would be returned to the treasury. *See Camelot*, 2020 WL 2088637, at *13.

## CONCLUSION

Congress created the PPP because it recognized that the pandemic has indiscriminately caused tens of thousands of businesses to financially drown. The Defendants' duty is to throw all eligible small businesses a lifeline without favoritism, not unilaterally decide that some businesses *should* be allowed to sink because their expression is disfavored.

For the foregoing reasons, Plaintiffs ask the Court to grant preliminary injunctive relief, and for any other relief to which they may be justly entitled.

Respectfully submitted,

WALLACE & ALLEN, LLP

*/s/ Casey T. Wallace*
Casey T. Wallace
State Bar No. 00795827
SDTX Bar ID: 20117
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
cwallace@wallaceallen.com
**ATTORNEY-IN-CHARGE
FOR PLAINTIFFS**

**OF COUNSEL FOR PLAINTIFFS**
William X. King
State Bar No. 24072496
SDTX Bar ID: 1674134
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
wking@wallaceallen.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document has been served on counsel of record in accordance with the Federal Rules of Civil Procedure via email and/or filing through the Court's ECF system on August 3, 2020.

Richard A. Kincheloe
Assistant United States Attorney
1000 Louisiana St., Suite 2300
Houston, TX 77002
Tel: (713) 567-9422
Fax: (713) 718-3033
Richard.kincheloe@usdoj.gov
**ATTORNEY-IN-CHARGE FOR DEFENDANTS**

/s/ Casey T. Wallace
Casey T. Wallace